UNITED STATES of America, Plaintiff-Appellee,

v.

Ronald Anthony MILANO, Defendant-Appellant.

No. 531-70.

United States Court of Appeals, Tenth Circuit.

June 11, 1971.

Rehearing Denied July 13, 1971.

Donald M. Burkhardt, Denver, Colo., argued the cause for appellant.

Gordon L. Allott, Jr., Denver, Colo., argued the cause for appellee.

Before SETH, COFFIN * and DOYLE, Circuit Judges.

* Of the First Circuit, sitting by designation.

COFFIN, Circuit Judge.

This case is an appeal from defendant's conviction for bank robbery in violation of 18 U.S.C. § 2113(a). On appeal, defendant asserts a variety of reasons for reversal.

### Continuance of Preliminary Examination

Defendant's preliminary examination was set for April 2, 1970, but was continued until April 7 over defendant's objection. The April 7 date was chosen in part because defendant was concerned that an indictment would be handed down before the preliminary examination could be held. On April 7, defendant moved for another continuance which was granted. The following day, April 8, an indictment was handed down, and no preliminary hearing was held. Defendant argues that the first continuance was error.

It does not appear in the record before us whether the first continuance, issued over defendant's objection, was an order of a judge of the district court made after the appropriate findings required by 18 U.S.C. § 3060(c). But even if this were not the case, there would be no grounds for reversal. First, a defendant's remedy for an improperly delayed preliminary examination is discharge from custody or the requirement of bond under 18 U.S.C. § 3060(d). This release is without prejudice to the institution of further proceedings upon the same charge. Second, no preliminary examination is required if an indictment is obtained first. 18 U.S.C. § 3060(e). We take these two sections to mean that defendant's remedy, if he was entitled to any, was release when his preliminary hearing was delayed, but that he could still be tried for the same offense if an indictment were subsequently handed down. The statute, as we read it, determines that the sole purpose of the preliminary examination is to test probable cause in order that innocent persons will not continue under

arrest. If that determination is made by another means, there is no prejudice to defendant.

Defendant relies on Blue v. United States, 119 U.S.App.D.C. 315, 342 F.2d 894 (1964), cert. denied, 380 U.S. 944, 85 S.Ct. 1029, 13 L.Ed.2d 964 (1965), and Ross v. Sirica, 127 U.S.App.D.C. 10, 380 F.2d 557 (1967), which did say that the preliminary examination also provided the defendant with discovery. But that is merely an incidental benefit —which varies widely from case to case, depending on how much evidence the government produces at this early state —and not the statutory purpose. *Blue* and *Ross* have not been followed in other circuits. *Cf.* United States v. Karger, 439 F.2d 1108 (1st Cir. 1971). Moreover, 18 U.S.C. § 3060 was enacted after both cases, and, we think, clarifies the statutory purpose. *See generally* United States v. Hinkle, 307 F.Supp. 117 (D.D.C.1969); Weinberg & Weinberg, The Congressional Invitation to Avoid the Preliminary Hearing: An Analysis of Section 303 of the Federal Magistrates Act of 1968, 67 Mich.L.Rev. 1361, 1390–93 (1969).

■ Absent evidence of deliberate prosecutorial connivance to deprive a person of a preliminary hearing by delay until after indictment, as to which we express no opinion, a defendant is not entitled to a new trial even if the hearing were improperly delayed.

### The Identifications

Three witnesses identified defendant as the bank robber at trial. At least two had picked him out of a line-up previous to the in-court identification, but all had observed a picture of defendant in the newspapers prior to the line-up. Defendant argues that the publication of his picture along with an account of the bank robbery and his prior criminal record so tainted the subsequent identifications as to make them inadmissible.

■ The Supreme Court has held that the reliability of eyewitnesses' iden-tification is generally a matter for the jury, but that in some cases the procedures leading to the identification may be so conducive to mistaken identification as to be a denial of due process. Foster v. California, 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). A court's framework for determining whether identification procedures were impermissibly suggestive is "the totality of the circumstances." *Foster, supra,* 394 U.S. at 442, 89 S.Ct. 1127.

■ We have reviewed the testimony in this case and decide that the publication of the newspaper picture did not lead to irreparable mistaken identification. All of the witnesses testified that the pictures were not the basis for their identification. All testified to details of defendant's appearance not evident in the picture; one witness even testified that the picture hardly resembled defendant. It appears that at least one witness may have picked defendant's and another man's pictures from a group of pictures when asked, before the newspaper items appeared, to select photographs that resembled the robber. This case is considerably different from the *Foster* case where the witness was uncertain until two line-ups and a one-to-one confrontation between the witness and the suspect had been held, and more like *Simmons* where the Supreme Court upheld identification testimony of witnesses who had been shown snapshots of some of the robbers during the investigation.

We agree with defendant that it would be better if witnesses made positive identification before seeing newspaper photographs of identified suspects. But we are unwilling to make a per se rule that such photographs indelibly

taint subsequent identification. To do so might require us to tread on delicate First Amendment ground. Furthermore, we hesitate to discourage law enforcement agencies from releasing pictures of wanted suspects to the press in order to obtain the public's help in apprehending them. *See* Simmons v. United States, *supra,* 390 U.S. at 384–385, 88 S.Ct. 967. We cannot say that such identification was so unreliable that a jury should not have been allowed to consider it.

### Search and Seizure

When the robber left the bank, he threw the money, part of which was in a brown paper bag, into a waiting car, driven by another person, who turned out to be defendant's sister. She was made a co-defendant and tried separately. Meanwhile, in the bank an alarm was sounded, and a nearby police officer responded. He arrived at the bank and was met by an employee who described a pink Thunderbird automobile with license number SD6648 as having pulled away after the hold-up. The officer and the bank employee drove in pursuit of the car and spotted a pink Thunderbird with license number SD5648, which the employee said looked like the same car. The officer pulled the car over to the side of the road and radioed for a back-up car. When a second officer arrived, the first policeman informed him of what was happening, and the two men approached the car from opposite sides. While making the arrest of co-defendant, the second policeman opened the passenger side door and saw some currency. Further investigation turned up the loot and a brown paper bag with defendant's fingerprints on it.

Defendant argues that this search was illegal because the second officer did not have probable cause to arrest. The facts we have stated above are sufficient to refute this assertion, assuming that defendant has standing to raise it. As a second argument, defendant claims that the search which turned up the evidence went beyond what was incidental to the arrest. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). We disagree. It was manifestly proper for two policemen to approach the car of a suspected participant in a bank robbery with considerable caution. This caution led the officers to open the car doors on each side in making the arrest, thereby decreasing the suspect's opportunity to forceably resist. The opening of the passenger side door was therefore a part of the arrest and not a gratuitous search. Some of the loot was in clear view as a result of the arrest. The remainder of the money and the paper bag were found in the back seat when the arresting officer gathered the visible evidence. There was no illegal search here; money was in plain view, and the remainder of the evidence came into view as the visible money was gathered in.

### Fingerprint Evidence

Subsequent analysis revealed that the brown paper sack taken from co-defendant's car, contained fingerprints of the defendant as well as smudged, partial, and unidentifiable prints. Defendant argues that this fingerprint evidence was inadmissible because there were other unidentifiable prints on the bag and because there was no evidence that these prints were made during the robbery. This particular bag was not identified as the bag used by the robber, and defendant argues that he could have handled it before the robbery.

Defendant relies on cases which say that similar fingerprint testimony "is not sufficient to support a conviction". We agree that standing by itself, this testimony would be insufficient to support a conviction, but there was ample additional evidence in this case linking defendant to the crime. The fingerprint testimony was relevant; this is not a case where there was no evidence,

direct or circumstantial, linking the fingerprints to the commission of the crime. *Cf.* Borum v. United States, 127 U.S.App.D.C. 48, 380 F.2d 595 (1967).

### Handwriting Testimony

The bank robber used the standard procedure of handing a note to the teller. The authorship of the note was therefore relevant to the identification of the robber. Defendant obtained government funds to hire a handwriting expert, pursuant to 18 U.S.C. § 3006A(e). The form, filed with the government to obtain funds for the expert and stating his name, was sealed and not available to the government although the expert's bill was available. Nevertheless, the government did not learn about the handwriting expert's employment until the expert sought a copy of the bank robber's note from the FBI.

Before trial, defendant had moved under F.R.Crim.Proc. 16(b) for discovery of certain government documents. The day before trial the government moved pursuant to F.R.Crim.Proc. 16(c) for all scientific reports which defendant intended to produce at trial. Rule 16(c) provides that if the court grants the defendant discovery of government documents under 16(b), it may condition that discovery upon the defendant's permitting the government to discover similar documents.[1] At the hearing on the government's discovery motion, it was revealed that defendant had previously indicated, informally, to the government that he planned to introduce no documents of the type the government sought to discover. Despite this informal representation, defendant objected to the government's 16(c) motion and refused to reveal on the record whether or not he would introduce discoverable

evidence. The district court granted the government's motion for discovery, and defendant then formally confirmed that he would introduce no such evidence. The government discovered no evidence but it did learn, from the fact that no scientific reports would be introduced, that the defendant would not call his handwriting expert.

At trial the government called the handwriting expert as its witness. After the expert was qualified, defendant successfully objected, the court ruling that making the expert the government's own witness violated the spirit of the Criminal Justice Act, 18 U.S.C. § 3006A(e). Later, however, defendant took the stand and flatly denied that the handwriting on the robbery note was his. After ascertaining that defense counsel knew that the expert would contradict this testimony, the court allowed the expert to testify as a rebuttal witness for the government.

Defendant makes three arguments concerning this handwriting evidence. First, he says it was prejudicial, assuming the testimony was inadmissible, to call the witness, qualify him, and then to sustain an objection. The jury would conclude, he argues, that the testimony was unfavorable. We disagree with the argument that the jury would reach such a conclusion, but the issue is moot because the testimony was eventually admitted. Thus, the question is actually the admissibility of the rebuttal testimony.

■ On that issue, defendant has a second argument: it violated the spirit of the Criminal Justice Act, which provides for funds with which to secure expert witnesses for indigent defendants, to allow the government to learn of the

---

1. There is nothing in the statute requiring the court to impose this condition at the same time it grants defendant's discovery. It may condition its original 16(b) order at a later date. Defendant's objection to the timing of the 16(c) order is without merit. Regardless of when the government is allowed discovery, defendant eventually must face the dilemma of using his discovered evidence at the price of revealing it to the government or forestalling the government at the price of foregoing use of evidence he has discovered.

existence and identity of those witnesses. Preliminarily, we observe that the government did not learn of the witness because of the act, but because the witness contacted the FBI. Thus, no disadvantage flowed from defendant's indigency; an expert hired by a wealthy defendant might also have sought a sample from the FBI.

More important, assuming that defendant is right and, as the district court ruled, the expert could not testify as part of the government's case, it was still permissible to admit the testimony in rebuttal. To hold otherwise would enable a defendant to convert a weapon devised to assist him in preparing his defense into one which could be unfairly used to immunize falsehood. For example, in this case, the government knew, by wholly proper means, i.e., the visit to the FBI by the handwriting expert, that there had been a handwriting analysis. It had reason to believe, again by proper means, i.e., defendant's voluntary representations that he would introduce no discoverable evidence, that such an analysis would not be used. It therefore had every reason to believe that no handwriting expert would be called by defendant, that the analysis was not favorable to defendant, and that defendant might therefore not testify. So thinking, the government might be indulged for not procuring its own handwriting expert. If, on defendant's taking the stand and swearing that the handwriting on the hold-up note was not his, the government were to be rendered helpless to call a known, local expert witness to testify to the contrary, neither justice nor the spirit of the Criminal Justice Act would be served. For, while the latter may arguably not be used to strengthen the government's case-in-chief, it cannot serve as a shield for perjury simply because evidence properly brought to government attention has been developed through Criminal Justice funds. This conclusion follows *a multo fortiori* from Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), where the Court allowed *Miranda*-defective statements as admissible in impeachment.

As a third argument, defendant claims that the initial granting of the government's discovery motion under F. R.Crim.Proc. 16(c) violated the privilege against self-incrimination. According to defendant, Rule 16(c) conditions the exercise of the defendant's discovery procedure upon the waiver of the right against self-incrimination. *Cf.* United States v. Fratello, 44 F.R.D. 444 (S.D. N.Y.1968); Proposed Federal Rules of Criminal Procedure, Mr. Justice Douglas' Statement, 39 F.R.D. 69, 276–77 (1966). The problem of self-incrimination and discovery in criminal cases is a vexing one on which there is little harmony. *See* 1966 Committee Note to Rule 16, 8 Moore's Federal Practice ¶ 16.01[3] (2d ed. 1970). We find it unnecessary to decide the question in this case because the granting of the government's motion for discovery, if error, was harmless.

The government obtained no documents or evidence from defendant because defendant did not plan to introduce any evidence discoverable under Rule 16(c). Thus, all the government gained was the knowledge that the defendant would not introduce certain kinds of evidence. This knowledge was significant only because the government had learned by chance that the defendant had hired a handwriting expert. But there is no proof that this knowledge caused the government to subpoena the expert. Defense counsel had already volunteered the information that he planned to introduce no 16(c) evidence; the discovery order only confirmed the fact. The record is silent as to whether the government subpoenaed the expert before or after its motion for discovery was granted. Thus, we have a situation where the government discovered no evidence; where it may not have discovered any information to supplement its

prior knowledge; where even if the information was helpful, it was helpful because the government had accidentally learned of the existence of the expert—a situation which may be infrequent; and where the fruit of the knowledge produced evidence which would not have been admitted except in rebuttal to defendant's contradictory testimony. On that record, we cannot conclude that Rule 16(c) compelled defendant's self-incrimination; if there was error, it was harmless.

### Admissibility of Co-defendant's Statement

After defendant's sister's arrest, she made a statement to a government agent exonerating defendant and implicating a third person as the bank robber. At trial, defendant called his sister to the stand, but she declined to testify, exercising her privilege against self-incrimination. Defendant then called the government agent and attempted to elicit the statement made by the sister. The district court sustained the government's hearsay objection, which defendant asserts was error.

█ This court has recognized an exception to the hearsay rule where testimony is unavailable because a witness exercises his privilege against self-incrimination and where there is prior recorded testimony by the witness in a proceeding in which the opposing party has had the opportunity to exercise its right of cross-examination. United States v. Allen, 409 F.2d 611 (10th Cir. 1969); Mason v. United States, 408 F. 2d 903 (10th Cir. 1969), cert. denied, 400 U.S. 993, 91 S.Ct. 462, 27 L.Ed.2d 441 (1971). Both parties agree here that the sister's testimony was unavailable within the meaning of *Allen* and *Mason*.

█ When the sister made the statement, however, it was not subject to a full cross-examination. The requirement of an opportunity to cross-examine is an important element of this exception to the hearsay rule, in part, because it is an indicator of the testimony reliability. An interrogation by an FBI agent transporting the witness from the place where she was apprehended is not a substitute for cross-examination. At such a stage in the case, the agent would have inadequate information to cross-examine if he wished to do so. Moreover, there may have been no desire on the government's part to test the veracity of the sister's story immediately; taking a statement that can be proven false is helpful to the government for purposes of impeachment later on. Thus, an agent hearing a story he believed false might be content to let the witness complete it rather than attempting to confront the witness and possibly induce her silence. In addition, there was no stenographer; the witness was not under oath; the formal and truth-inducing courtroom atmosphere was absent. Finally, an FBI agent is not likely to be so skillful a cross-examiner as a trial lawyer.

Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), is not supportive of defendant's position. *Dutton* also involved hearsay testimony concerning a statement made by a co-defendant after arrest, but the opinion is narrowly confined to the particular facts of the case, 400 U.S. at 86, 91 S.Ct. 210 and is therefore not easily applied. The Court does emphasize, however, "indicia of reliability * * * as determinative of whether a statement may be placed before a jury though there is no confrontation of the declarant." 400 U.S. at 89, 91 S.Ct. at 220. In *Dutton*, the out-of-court statement seemed reliable because:

> "These circumstances go beyond a showing that Williams [the declarant] had no apparent reason to lie to Shaw [the witness]. His statement was spontaneous, and it was against his penal interest to make it." 400 U.S. at 89, 91 S.Ct. at 219.

The sister's attempt to exculpate her brother and herself is far different from

a co-conspirator's angry outburst casting blame on his partner for his troubles.

### Miscellaneous Points

Defendant raises four other grounds for reversal, none of which merits prolonged discussion.

At a pre-trial hearing in which defendant and co-defendant both participated, co-defendant objected successfully to defendant's cross-examining her. She was testifying in support of two suppression motions she had made. We fail to see how the court's ruling that defendant lacked standing to participate in a hearing on co-defendant's suppression motions was prejudicial. Defendant had filed no suppression motions of his own at this point. If he was prejudiced by not fully participating at his sister's suppression hearing, he could have filed his own motions and had his own hearing.

Defendant objected to a statement by counsel for the United States in final argument. Defendant cannot indicate how this statement, which concerned a minor part of the case, was prejudicial. At worst, it refuted an argument defendant never made.

Defendant also objects to two instructions. In the first, the court misread the statute, 18 U.S.C. § 2113(a), which begins "Whoever, by force *and* violence or by intimidation." Instead, the court said, "Whoever, by force *or* violence or by intimidation." Insofar as we can tell, there is no important difference between the way the statute was read and the way it should have been read. Moreover, the jury had a copy of the indictment which quoted the statute correctly. This is harmless error.

The court also misread a second instruction by dropping a line. We have read the requested instruction and the instruction as given and find that the omission of the line does not alter the content of the requested instruction or prejudice defendant's case.

Affirmed.